
George C. Paine, II
US Bankruptcy Judge
Dated: 12/11/09



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

In Re:
       )
**WILLIAM LEE SAMPLES** ) **CASE NO. 06-03113**
  **Debtor.**    ) **Chapter 11**
       ) **Hon. George C. Paine, II**
       )
**AMPHARM, INC.**   )
  **Plaintiff,**   )
       )
**v.**      ) **Adv. No. 06-0346A**
       )
**WILLIAM LEE SAMPLES** )
  **Defendant.**   )

---

## MEMORANDUM

---

  This matter is before the court on AmPharm Inc.'s ("Ampharm") complaint to find the debt owed to it by William Lee Samples, if any, nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and or (a)(2)(B). William Samples ("Samples" or "debtor") contends that the debt is the corporate debt of Eastland Pharmacy Services, LLC ("EPS"), and even if the corporate veil is pierced to charge him personally with the debt, it is nonetheless dischargeable. For the reasons more specifically stated herein, the court finds that AmPharm did not carry its burden of proof to pierce EPS's corporate veil, nor did AmPharm prove that the debt should be discharged under§ 523(a)(2)(A) and (B).

### Factual Background

  These parties are not strangers to litigation, and have been involved in an

exhausting state court battle since at least October, 2001. In that proceeding, the Circuit Court for Williamson County granted AmPharm's summary judgment motion against EPS and William Samples individually, finding them liable in the amount of $120,443.07. The Tennessee Court of Appeals affirmed EPS's liability to AmPharm, but reversed and remanded on the issue of Samples' personal liability. This court has been asked to decide whether EPS's corporate veil should be pierced to impute EPS's liability to Samples, and if so, to decide if the debt is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and/or (B).

The court borrows heavily from the factual findings of the Tennessee Court of Appeals' decision, and supplements their findings where necessary. **See AmPharm, Inc. v. Eastland Pharmacy Services, LLC.**, 2008 WL 4830803 (Tenn. Ct. App., Nov. 5, 2008). EPS is a limited liability corporation originally created in 1998 for the purpose of operating a home health care pharmacy by William Samples and Thomas E. Mayers. Because neither Mayers nor Samples were pharmacists, they agreed to include Norman Noffsinger in their business in order to operate EPS as a pharmacy. EPS loaned Noffsinger $245,000.00, the initial capital Mayers and Samples contributed to EPS, to purchase an operating pharmacy. Ownership of EPS was then shared equally among Samples, Noffsinger, and Mayers.

Shortly after EPS commenced operations, its members decided to begin a new business venture. On June 9, 1998, the members of EPS organized, under the laws of Tennessee, a business known as Data Medical, Inc. ("DMI"). The purpose of DMI was to electronically process, with the appropriate governmental entities, Medicare and Medicaid claims. Mayers, Noffsinger and Samples each had an equal membership interest in DMI. In November, 1998, DMI borrowed $300,000.00 from First Union Bank. Noffsinger and Mayers pledged their homes, and Samples pledged

a personal securities account to collateralize this loan. DMI was not a successful entity.[1] Eventually, through several workouts, deals, and resignations, the $300,000 First Union Bank loan fell to Samples personally to repay, and Noffsigner remained liable as a guarantor.

On June 28, 1999, Noffsinger assigned his membership interest in EPS to Samples, but Noffsinger continued his employment as a pharmacist for EPS. On March 1, 2000, Mayers resigned as a member of EPS in exchange for a promissory note executed by EPS for $20,000.00. At this point, Samples became the sole member of EPS.

Samples and Noffsinger began seeking a financial partner to help EPS implement a concept they called "CIPA," Clinical Independent Pharmacists of America. The CIPA concept involved providing comprehensive pharmaceutical services to mostly elderly patients who needed multiple, long-term medications. Samples and Noffsinger met with Don Ross, a Senior Vice President at American Health Centers ("AHC"), a Tennessee corporation, on February 14, 2001, to discuss the CIPA concept and their business plan. Ross signed a non-disclosure/ non-compete agreement on behalf of AHC to learn more about the CIPA idea.

The same parties met again on February 21, 2001. EPS presented a written proposal for a possible joint venture between EPS and AHC. Under the original proposal, EPS would have 60% ownership and AHC would have 40% ownership in

---

[1]By February 1999, DMI needed more capital to operate. The members of EPS agreed that EPS would borrow $100,000.00 from First Union Bank and loan a portion of those funds to DMI with EPS using the remainder to fund its operation. Mayers, Noffsinger and Samples each personally guaranteed this debt. By June of 1999 Noffsinger and Samples terminated the operations of DMI.

the new partnership entity. AHC would supply $600,000 in capital, and EPS would transfer its assets and liabilities to the new entity. The January 2001 Business Plan was divided into essentially two (2) parts: a written summary of the concept and another part containing financial projections based on certain "Assumptions."

The Business Plan provided more specifically as follows:

### Introduction
Eastland Pharmacy Services is an ongoing mail-order pharmacy specializing in the dispensing of diabetic and respiratory supplies. . . The purpose of the Business Plan is to describe a unique marketing approach, combining efficiency of a mail-order model and use of clinical services designed to capture and keep these profitable patients.

. . .

### Growth Initiative: Plans for Financing
The company will require approximately $600,000 to implement this Plan.

. . .

### Management Overview
EPS has formed a management team capable of positioning the company to capture and hold a strong market position, assuring its place as an industry leader in providing cognitive and mail order pharmacy services.

. . .

EPS has accomplished its goal of securing a proven management team, Norman Noffsinger, D.PH., FACCP, is nationally recognized in his profession for his extensive knowledge or pharmacy and Medicare billing systems. . . . William L. Samples, Vice President of Business Development, is the major owner of EPS. . . . Scott Trochtenberg, MD, FCCP, Vice President and Medical Director has extensive background in managed care and clinical pharmacology.

. . .

### Disclaimer
The Executive Summary is intended solely for the purpose of providing a summary of the EPS Business Plan to potential investors and strategic partners. Every effort has been made to provide accurate information, but EPS does not warrant any of the information contained in this Executive Summary or the full EPS Business Plan.

. . .

### Financial Summary and Proformas
### Summary
EPS growth initiatives proforma projections were developed using the

information contained in the Financial Assumptions section of the plan. These assumptions reflect the knowledge gained by the company in its market analysis and the experience of the management team.

Initially, the company will endeavor to secured an Agreement with CareLink/Health Essentials and begin admitting existing EPS patients into the growth initiative.

Sometime between February 14, 2001 and February 21, 2001, Ross provided the Business Plan to other principals of AHC who at the time constituted AHC's management team. These individuals included Jim Smith, President of AHC, and Mary Ivey, a Senior Vice President and Robert Brownyard who at the time was the Manager of AmPharm, Inc. AmPharm Inc. is AHC's wholly owned subsidiary under which AHC operated a pharmaceutical business.

On March 2, 2001, Samples, Noffsinger, and Dr. Scott Trochtenberg, EPS's medical director, met with the AHC board of directors. The parties agreed to a 50/50 ownership between EPS and AHC.[2]  On March 7, 2001, Samples, Ross and Noffsinger met in Brentwood, Tennessee and Ross informed EPS that the AHC Board had given its approval to further investigate a joint business venture. Generally, the parties agreed that EPS would contribute its CIPA concept, its assets and liabilities and AHC would contribute $100,000.00 in cash initially with an eventual cash contribution of up to $600,000.

Many of the critical negotiations took place during the March and April 2001 time frame. In early March, Samples and Noffsinger informed AHC about a potential referral source of significant clients under their CIPA idea from a Dr. Melvin

---

[2]On March 13, 2001, AHC notified EPS that the business plan had to be rewritten to eliminate the participation of Health Essentials, a company with which EPS had been negotiating to be part of the implementation scheme. This change in the business plan resulted from a meeting in Richmond, Virginia with AHC's counsel and Noffsinger.

Lightford. Lightford's referral of patients to EPS resulted in more business than EPS had credit to purchase pharmaceuticals. Through some form of discussions among Samples, Noffsinger, Brownyard, and possibly Smith and Ross, it was agreed that EPS would be allowed to use AmPharm's credit account with drug wholesaler Bergen Brunswig ("Bergen"). On March 29, 2001, EPS made its first purchase of pharmaceuticals using the AmPharm account. Brownyard helped EPS with the ordering of pharmaceuticals.[3]

In April 2001, Brownyard began working with Noffsinger filling prescriptions at EPS as part of AHC's due diligence. The discussions between EPS and AHC had assumed that Dr. Trochtenberg would be Medical Director, but in April 2001, Trochtenberg dropped out of any future joint venture when he became employed by Meharry Medical. The parties, nonetheless, proceeded with negotiations and it was decided that a new company should be created to carry out EPS's Business Plan. The name of this new venture was PharmAssist Healthcare, LLC. The Articles of Organization were filed on April 23, 2001, and Anne Vise, AHC's Chief Financial Officer, opened up PharmAssist's new bank account.

Anne Vise, was brought in on the negotiations sometime in mid to late March 2001. Ms. Vise was charged with conducting AHC's financial due diligence including creating a joint balance sheet for the new PharmAssist entity. Ms. Vice testified that she did not begin her financial investigation and due diligence until sometime in mid

---

[3]There was no written agreement regarding the terms of repayment. Invoices were sent by Bergen Brunswig to EPS for purchases made on the AmPharm, Inc. account. The state court and Tennessee Court of Appeals found that the purchases made by EPS on AmPharm's account were the debt that was to be repaid by EPS. There is no dispute that EPS, therefore, owes AmPharm for the drugs purchased. The only question is Samples personal liability for the drug purchases by piercing the corporate veil and the dischargeability of any debt owed by Samples.

April 2001 when she asked for specific financial information to be produced by EPS to AHC.[4]

On April 30, 2001, Ms. Vise sent to EPS a request for the following financial documents:

> In anticipation of the formation of PharmAssist Healthcare, LLC, please forward to my attention the following as soon as available:
>
> 1. A detailed Accounts receivable aging by payor source, by patient as of April 30, 2001.
>
> 2. A detailed listing of all physical assets (desks, chairs, equipment, prints, etc.) that will be "contributed to PharmAssist Healthcare, LLC as well as an assigned value for each.
>
> 3. Details of Accounts payable – Trade as of April 30, 2001.
>
> 4. A copy of the "Eastland Pharmacy Loan" agreement and any related amortization schedules.
>
> 5. Employee listing, including rate of pay and original date of employment.
>
> 6. A copy of current payroll policies including benefits package. Terms of health and other payroll related insurance policies/plans.
>
> 7. The proposed value of "goodwill", the process that will be contributed.
>
> 8. Any other asset/liabilities that Eastland intends to contribute to the LLC.

Vise did not request copies of EPS's or Samples' tax returns, did not request copies of employment agreements, did not request copies of any non-compete agreements, and did not request any documentation or other support to justify the value of EPS's goodwill. On June 12, 2001 and subsequently thereafter as requested, Samples provided AHC with the requested financial information. This financial information included financial statements for the periods April through July 2001, information regarding loans for which EPS was responsible, aged receivables,

_____

[4]Her specific testimony was that in her mind, financial due diligence begun on April 19, 2001.

physical assets (valued at $106,700), and a goodwill value of $345,000.

Vise, at that point, created a proposed joint balance sheet. Her cover letter to EPS states:

> Here is the proposed Balance Sheet of PharmAssist as of the date of combination.. The following are the assumptions:
>
> . . .
>
> 3.    The total asset value is to be $600,000, per member, resulting in the Goodwill entry of $306,657.81.
>
> . . .
>
> 5.    AHC will initially fund $100,000 cash. The balance of $500,000 will be available as needed (therefore the receivable from AHC).

The proposed joint balance sheet created by Ms. Vise showed a goodwill value of $306,657.81. Ms. Vice also had an entry on the proposed balance sheet of $207,955.31 where she "forced" or "created" a number assigned under the category "EPS-non-compete/lease co-obligation" to configure the contribution of each member, EPS and AHC to be exactly equal at $600,000 apiece.

EPS continued to order pharmaceuticals through AmPharm's account. The May 31, 2001 balance sheet of EPS shows an amount of $113,293.52 for "accounts payable trade." According to AmPharm/AHC, this is the exact amount of purchases made by EPS on the AmPharm account to that date.

On June 1, 2001, a meeting was held at the Mercury Airport in Nashville. In attendance were Jim Smith, CEO of AHC, Ross, Noffsinger, Samples, and attorneys for both parties. After that meeting, a number of terms remained unresolved, including the responsibility for EPS debt, terms of employment contracts, and capital

call requirements. In early June 2001, AHC provided a revised draft of an operating agreement and bylaws for PharmAssist. No operating agreement was ever signed for the PharmAssist joint venture.

On June 20, 2001, Smith and Ross met with Samples and Noffsinger and informed them that AHC had decided to take another route and proposed to purchase EPS instead. On June 22, 2001, AHC sent EPS a letter of intent reflecting its interest in purchasing EPS. The letter was expressly made "subject to the negotiation and execution of formal and definitive agreement(s) among the parties." The letter of intent contained a number of contingencies, including a due diligence investigation with results satisfactory to AHC and the execution of "a definitive purchase agreement evidencing the foregoing transaction." Another provision stated that, except with respect to the confidentiality, exclusivity, and brokerage provisions, "no party is bound hereby, nor shall any claim be made based upon any good faith obligation to undertake negotiation." The letter of intent was to expire on June 29, 2001. On June 28, 2001, EPS made its final purchase of pharmaceuticals on the AmPharm account. The same day, AHC sent EPS another letter stating that "[u]nless the parties can come to terms on this acquisition by the close of business on Friday, June 29, 2001, AHC expects and hereby demands Eastland's immediate delivery to AmPharm, Inc. of $120,443.07 in cash or combination of cash and inventory to cover the credit previously extended to Eastland." EPS submitted a counterproposal to AHC regarding the sale; AHC rejected the counterproposal. AHC revised the letter of intent to terminate on June 30, 2001.

On July 2, 2001, AHC sent EPS a letter stating that, since the parties had not come to terms on the acquisition, an AHC representative would arrive at EPS that day to collect a check or inventory or combination thereof in the amount of

$120,443.07. EPS refused to allow AHC access to its offices. In a letter dated July 2, 2001, EPS's attorney stated that, "regardless of how Eastland and AHC have arrived at the present situation, Eastland is prepared to make arrangements to pay the amount owed to AmPharm, Inc. upon mutually agreeable terms."

The parties subsequently renewed negotiations, and on July 20, 2001, AHC sent EPS another letter of intent regarding the acquisition. This letter of intent contained the same contingencies and limitations previously described with respect to the original letter of intent. EPS made a counteroffer on August 3, 2001. AHC made a final offer on August 15, 2001 and sent EPS another letter of intent with the same contingencies and limitations on August 21, 2001. Samples never signed either letter of intent.

At this same time, Samples was negotiating with another company, Max Well Medical. On September 11, 2001, AHC sent EPS a letter confirming that the deadline in the final letter of intent had expired and demanding payment of $120,443.07. On October 11, 2001, Samples sent Smith a letter in which he stated that EPS was "very interested in working with you and American Health Centers in some capacity to settle the outstanding liability that was incurred during our venture negotiations."

In July 2002, Samples signed a confidentiality agreement with Windsor Pharmacy Services, LLC. In February 2003, EPS and Windsor signed a letter of understanding. On March 1, 2003, Windsor and EPS entered into a consulting agreement whereby Windsor would pay Samples a consulting fee. Windsor and EPS also entered into an option agreement giving Windsor the option to purchase EPS's assets. In December 2003, Windsor and EPS entered into a settlement agreement

under which Windsor paid Samples lump sums of $17,000 and $29,094 and payments of $8,500 a month for twelve months. In exchange, EPS surrendered all collateral, including the CIPA concept rights.

Before the Windsor negotiations began, in October 2001 AmPharm filed a complaint against EPS alleging two claims: a breach of contract claim based on an oral agreement whereby AmPharm extended credit to EPS for the purchase of pharmaceuticals, and a claim for unjust enrichment. In August 2002 EPS filed a third-party action against AHC alleging that EPS and AHC had formed an oral partnership and that AHC had wrongfully withdrawn from the partnership. EPS sought damages and an order requiring the winding up of the partnership's affairs. In April 2004, AmPharm and AHC filed an amended complaint adding a claim for the individual liability of Samples.

In February 2006, Samples filed a motion for partial summary judgment on the individual liability claim. At the same time, AmPharm and AHC filed a joint motion for summary judgment in their favor on all claims. The motions were heard on May 8, 2006 in the Circuit Court from Williamson County. On May 22, 2006, the court entered an order granting AmPharm/AHC's motion for summary judgment and denying EPS/Samples's motion for partial summary judgment. The court found "[n]o partnership or joint venture was formed as a matter of law, and there was no 'wrongful' withdrawal from a non-existent partnership or joint venture." As to the personal liability issue, the court concluded, as a matter of law, "that the corporate veil of Eastland Pharmacy Services, LLC should be disregarded, and that William L. Samples, shall be held personally liable for the debt owed to AmPharm, Inc. in the amount of $120,443.07." The court also awarded prejudgment interest.

Samples appealed to the Tennessee Court of Appeals. On November 5, 2008, the Court of Appeals affirmed EPS's liability to AmPharm but remanded to the lower court for a trial on the issue of Samples' personal liability. In the meantime, after the Circuit Court's grant of summary judgment finding Samples personally liable, he filed his chapter 11 bankruptcy on June 21, 2006. On September 19, 2006, AmPharm filed the present adversary proceeding seeking to hold the debt owed to it nondischargeable. This court allowed the state court appeal to proceed before holding a nondischargeability trial. Following the Tennessee appellate court's decision to remand to the state court on the issue of piercing the corporate veil, the matter in the adversary proceeding was heard on December 2-3, 2009.

## DISCUSSION
### I. Nondischargeability Pursuant to § 523(a)(2)(A) and (B)
#### A. Generally

AmPharm has argued that the court should first determine if the corporate veil should be pierced, and if finding that it should, then the court should decide nondischargeability. Samples suggests that if the debt is dischargeable, then there is no reason to decide if the veil should be pierced. Either path leads to the same destination. The court therefore, decides the dischargeability issue before discussing the piercing of EPS's corporate veil.

The party seeking a determination of nondischargeability bears the burden of proving the necessary elements by a preponderance of the evidence. **Rembert v. AT & T Universal Card Servs. (In re Rembert)**, 141 F.3d 277, 281 (6th Cir.) **cert. denied,** 525 U.S. 978 (1998). However, § 523(a) is construed liberally in favor of the Defendant and strictly against the Plaintiff. **Id**.

### B. Section 523(a)(2)(A)

To satisfy the burden of proof under § 523(a)(2)(A), appellees must prove by a preponderance of the evidence:

> (1) That appellant obtained money, property, or services through material misrepresentations which appellant knew were false or were made with gross recklessness;
>
> (2) That appellant intended to deceive appellees;
>
> (3) That appellees justifiably relied upon appellant's false representations; and
>
> (4) That their reliance was the proximate cause of their loss.

**Id.** at 280-81. Section 523(a)(2)(A) is construed strictly against the party seeking a determination of nondischargeability. **Id**. at 281. **Whitaker v. Koenig**, ___ B.R. ___, 2009 WL 3241744 (Bankr. E.D. Tenn., Sept. 30, 2009).

AmPharm must show that EPS and Samples obtained use AmPharm's Bergen account through material misrepresentations which EPS knew were false or were made with gross recklessness. "Material misrepresentations" are "substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision." **Whitaker**, at *2 (quoting **Haney v. Copeland (In re Copeland)**, 291 B.R. 740, 761 (Bankr. E.D. Tenn. 2003). AmPharm contends that EPS presented a Business Plan with an intent to deceive AmPharm. "Specifically AmPharm asserts that in order to induce AmPharm to provide its credit, the Debtor represented in the Business Plan that Eastland had secured a proven management team. . . " **Trial Brief of AmPharm**, Adv. Proc. 06-0346A, Docket No. 75, p. 11 (Nov. 30, 2009).

EPS's business plan did in fact state that it had secured a proven management team. According to Samples and Noffsinger's testimony, both men at the time of

negotiations with AHC, intended to go forward with the new business venture with Dr. Trochtenberg.[5]  All parties involved believed that this would be the management team for the new entity, and in fact, it may have turned out that way if the deal had not fallen apart.[6]  The Business Plan was merely that, a plan.  A plan is "a scheme or method of acting, doing, proceeding, making, etc., developed in advance."  **See www.dictionary.com (Dec. 8, 2009).**  EPS "planned", "designed," "formulated in advance" a diagram of how it projected the joint venture to proceed.  In doing so, Noffsinger, Samples and Trochtenberg "planned" to be a part of the venture. The court finds no material misrepresentation by EPS or Samples in their presentation of the Business Plan to AHC, and finds Samples clearly believed the Business Plan to be truthful at the time it was presented.

AmPharm claims that the Business Plan was misleading because it stated that EPS had "secured" a proven management team but in fact had no employment agreement with Noffsinger, Samples or Trochtenberg.  The securing, in this case, was in the eye of the beholder.  According to Samples uncontradicted testimony, EPS had "secured" Noffsinger because Noffsinger was invested in the CIPA concept (with "sweat equity) and also financially invested.[7]  "Secured" to AmPharm, apparently meant non-compete and employment agreements.  AHC and AmPharm, however, never asked to see copies of such agreements nor did they require those

---

[5]The court notes that the professional backgrounds outlined in the Business Plan were never shown to be inaccurate.

[6]The Business Plan also contained a "Disclaimer" section stating that EPS did not warrant any of the executive information to be correct despite efforts to insure its correctness.

[7]AHC and AmPharm were well aware of Trochtenberg's decision to take another position during the early negotiation stages of the deal.  The court, therefore, finds no merit to any claim that his absence from the deal or the failure to obtain an employment agreement with him allowed AmPharm to be mislead into allowing its Bergen account to be used by EPS.

agreements as a condition of going forward.

The court simply cannot find a material misrepresentation that would render this debt nondischargeable in the Business Plan presented by EPS that merely set forth the "road map" for what EPS and AHC hoped would be PharmAssist. If the court is somehow mistaken and those representations about the management team are found to be "material," the court would nonetheless find that this debt was dischargeable because Samples did not intend to deceive AHC or AmPharm.

To prevail on the second element AmPharm must prove that EPS intended to deceive them through EPS's misrepresentation. A debtor intends to deceive a creditor "when the debtor makes a false representation which the debtor knows or should have known would induce another to advance goods or services to the debtor." **Id**. (quoting **Haney**, 291 B.R. at 765-66). The bankruptcy court "must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.' **Id.** Any benefit of the doubt must be resolved in favor of the debtor. **Id.; XL/Datacomp v. Wilson (In re Omegas Group)**, 16 F.3d 1443, 1451 (6th Cir.1994).

The court does not find that EPS or Samples "intended" to deceive AmPharm to gain use of its pharmaceutical account with Bergen. Instead, Samples and Noffsinger credibly testified that they were trying to "grow" the proposed new joint venture by procuring a larger client base in anticipation of going forward with PharmAssist. The court found no proof in the Business Plan or otherwise to support a finding that EPS or Samples intended to trick AmPharm into use of its account with Bergen. All the proof in this case resounds loudly of an attempted but failed health care business venture. The court finds that the motivating factor in AmPharm

opening up its Bergen account was not the January 2001 language in the Business Plan that stated there was a proven management team, but instead was the momentum of the deal that all parties at the time thought would succeed.

Even if somehow the misrepresentations were materially false, and the court is wrong that Samples did not intend to deceive AmPharm, AmPharm would nonetheless have to show by a preponderance of the evidence that they actually relied on the representations of the Business Plan, their reliance was justifiable, and their reliance was the proximate cause of any loss. AmPharm cannot connect those dots. The provisions in the Business Plan about the CIPA plan's "proven management team" may have been relied upon to investigate whether a joint venture between AHC and EPS was viable. However, AmPharm cannot link up its decision to extend its pharmacy account to the Business Plan's provisions about the management team. The first order of pharmaceuticals on the Bergen account was March 29, 2001, and even after Dr. Trochtenberg left in April, orders on the account continued through the end of June. It was not until the deal totally fell apart over issues completely unrelated to management did AmPharm terminate EPS's use of the Bergen account.[8] Norsinger's, Samples' and even Ross' testimony all reverberated the truth of what happened here: an attempted, but failed business venture. The Business Plan provisions became the scapegoat after AmPharm was not paid back by EPS and/or Samples.

The court finds that AmPharm could not show any of the elements of § 523(a)(2)(A) by a preponderance of the evidence. Accordingly, the court finds that

_____

[8]Don Ross, a Senior Vice President with AHC, testified that the parties were unable to reach an agreement to go forward with the deal because EPS and AHC disagreed over a "capital call" provision. AHC continued negotiations to purchases EPS through August 2001 before filing suit to collect on the Bergen account advances.

the debt to AmPharm is dischargeable under this subsection of 523.

### C. Section 523(a)(2)(B)

Samples may not receive a discharge:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
...

        (B) use of a statement in writing-

                (i) that is materially false;

                (ii) respecting the debtor's or an insider's financial condition;

                (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

                (iv) that the debtor caused to be made or published with intent to deceive ...[.]

11 U.S.C. § 523(a)(2)(B). The requirements of this section are adeptly summarized by Judge Richard Stair in **In re Whisnant**:

In summary, a determination of nondischargeability under § 523(a)(2)(B) requires proof that the Plaintiff loaned money after it reasonably relied upon false financial documents concerning the Defendant and/or an insider which were provided by the Defendant either directly or indirectly, and that the Defendant intended to deceive the Plaintiff when doing so, and unless all of the statutory criteria are satisfied, the debt will be discharged.

**In re Whisnant**, 411 B.R. 559 (Bankr. E.D. Tenn. 2009) (citing **Haney v. Copeland (In re Copeland)**, 291 B.R. 740, 780 (Bankr. E.D. Tenn. 2003)).

As to this cause of action, AmPharm submits that financial information within the financial statements were know by EPS and Samples to be false and that they

were given to AmPharm with an intent to deceive. AmPharm's trial brief posits:

> By virtue of the credit that AmPharm ulitmately provided to the Debtor and Eastland based on the financial information contained within the financial statements, the Debtor was able to obtain money through the use of a statement in writing that was (i) materially false, (ii) contained financial information regarding the financial condition of Eastland, (iii) on which AmPharm reasonably relied, and (iv) that the Debtor provided to AmPharm with intent to deceive. This false financial statement has caused the obligations owed by the Debtor to AmPharm to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).

**Trial Brief of AmPharm**, Adv. Proc. 06-0346A, Docket No. 75, p. 12-13 (Nov. 30, 2009). The court finds multiple flaws within AmPharm's logic.

There is no dispute that there are "writings" in this case that would qualify as a basis to consider nondischargeability under § 523(a)(2)(B) in the form of financial statements. The court further finds that the financial information did regard EPS's financial condition. However, the court cannot find that the statements were made with an intent to deceive, or that AmPharm reasonably relied upon the financial information.[9]

### a. Reliance

The undisputed proof in the record established that AmPharm opened up its Bergen account for EPS's use as of March 29, 2001. Ms. Vise's request to EPS for financial information was not made until April 30, 2001. Ms. Vise's own testimony was that in her mind, financial due diligence of the proposed EPS deal did not begin

---

[9] Although it is not necessary to make a finding that the financial information provided was not materially false, to the extent that the court is mistaken about reliance or intent to deceive, the court would find that the financial information provided was not materially false. The fluctuation of the value of the physical assets and goodwill were not material to AmPharm's credit extension. To the contrary, AHC and AmPharm even adjusted EPS's goodwill on the joint balance sheet to make AHC and EPS equal partners in PharmAssist. The decision to extend credit on AmPharm's Bergen account was wholly unrelated to whether the desk in  Samples office was worth $5 or $500, but instead was a product of the momentum of the deal.

until April 19, 2001. AmPharm opened up its Bergen account with the hope of growing a fledgling business deal between EPS and AHC prior to any real financial investigation had begun. AmPharm cannot have relied upon false financial information that had yet to be produced at the time the credit was extended.[10]

### b.    Intent to Deceive

In considering AmPharm's § 523(a)(2)(A) allegations, the court finds Samples' testimony credible that neither he, nor EPS intended to deceive AHC and AmPharm. The court is convinced that the Bergen credit account was just a facilitation by AmPharm to grow the parties' business deal, and not the result of some fabrication by EPS or Samples. AmPharm is justifiably frustrated that EPS and/or Samples chose to pay other creditors ahead of AmPharm, but AmPharm simply did not carry its burden of proof to establish that EPS/Samples intended to deceive in the production of the EPS financial information.[11]

The court finds that AmPharm is unable to show by a preponderance of the evidence that EPS/Samples acted with an intent to deceive AmPharm into extending

---

[10]To the extent AmPharm claims to have relied upon the proforma financial projections in the Business Plan, the court finds that claim to be meritless. The proformas were financial projections based upon a successful business venture. The court found no proof that the projected financials for the new venture were fraudulent in any way. In hindsight the projections may have been unrealistic, but at the time, there was no proof of fraud in their hopefulness for the CIPA concept's success. Optimistic projections are the Holy Grail of ever nascent healthcare venture.

[11]It appears that just the opposite was true. AHC's Ms. Vise worked with EPS to configure a joint balance sheet showing that each AHC (who was to infuse cash) and EPS (who was to contribute EPS assets, liabilities and CIPA concept) were equal. This meant she had "force" an entry on the joint balance sheet to show that EPS was contributing the same amount as AHC. The joint balance sheet was created in early June to reflect the parties' status as of May 31, 2001. By that time, EPS already owed $113,293.52 on the Bergen invoices. Thus, the majority of credit had already been extended to EPS when the parties were still working to produce a joint balance sheet, that was, even at that time, still a work in progress as to the financials of each company.

credit and AmPharm cannot show that it reasonably relied upon any financial writing which was materially false. Accordingly, the court finds that Samples' debt, if any, to AmPharm is discharged pursuant to 11 U.S.C. § 523(a)(2)(B).

## II. PIERCING THE CORPORATE VEIL

The court, having found Samples is entitled to discharge the debt, if any, to AmPharm need not decide the issue of piercing the corporate veil, but will do so out of an abundance of caution in case any of its findings are in error concerning dischargeability. The Tennessee Court of Appeals has described the separateness of a corporation and its shareholders and when that separateness is to be disregarded:

> "Under Tennessee corporation law, a corporation and its shareholders are distinct entities." **Cambio Health Solutions, LLC v. Reardon**, 213 S.W.3d 785, 790 (Tenn.2006). By statute, a corporation is empowered "as an individual to do all things necessary or convenient to carry out its business and affairs," such as make contracts, incur liabilities, borrow money, and grant security interests in all or part of its property. **Tenn.Code Ann. § 48-13-102 (2002)**. "A shareholder of a corporation is not personally liable for the acts or debts of the corporation except that the shareholder may become personally liable by reason of the shareholder's own acts or conduct." **Tenn.Code Ann. § 48-16-203(b) (2002)**.

> The separate legal status given to a corporation "protects its shareholders from direct responsibility for the corporation's debts and other liabilities, except in rare circumstances when a plaintiff is successful in persuading a court to disregard the separate corporate entity, also referred to as 'piercing the corporate veil.' " **Cambio Health Solutions**, 213 S.W.3d at 790. In other words, the corporation is presumptively treated as a distinct entity, separate from its shareholders, officers, and directors, but the corporate entity may be disregarded upon the showing of special circumstances, such as that the corporation is a sham or dummy so that failure to disregard it would result in an injustice. **Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.**, 691 S.W.2d 522, 526 (Tenn. 1985); **Oceanics Schools, Inc. v. Barbour**, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003). "In an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock will be treated as identical." **Muroll Gesellschaft M.B.H. v. Tennessee Tape, Inc.**, 908 S.W.2d 211, 213 (Tenn.

Ct.App. 1995) (citing **E.O. Bailey & Co. v. Union Planters Title Guaranty Co.**, 33 Tenn.App. 439, 232 S.W.2d 309 (1950)). A corporate veil may be pierced, that is, the legal entity disregarded and the true owners of the entity held liable, when the corporation is liable for a debt but is without funds due to some misconduct on the part of the officers and directors. **Id**. (citing **Anderson v. Durbin**, 740 S.W.2d 417, 418 (Tenn. Ct. App. 1987)).

Piercing the corporate veil is an equitable doctrine applied in extreme circumstances to prevent the use of a corporate entity to defraud or perform illegal acts. **Nepp v. Hart**, No. M2005-2024-COA-R3-CV, 2006 WL 2582503, at *7 (Tenn. Ct. App. W.S. Sept. 7, 2006); **Canter v. Ebersole**, No. E2005-02388-COA-R3-CV, 2006 WL 1627288, at *1 (Tenn. Ct. App. May 13, 2006). A corporation's separate identity should be disregarded "with great caution and not precipitately." **Oceanics Schools**, 112 S.W.3d at 135 (quoting **Schlater v. Haynie**, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)). The conditions under which the corporate entity will be disregarded vary according to the special circumstances of each case, and the matter is particularly within the province of the trial court. **Electric Power Bd. of Chattanooga**, 691 S.W.2d at 526. The determination of whether a corporation is a mere instrumentality of an individual is ordinarily a fact question for the jury. **Id**. "The party wishing to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to this equitable relief." **Oceanics Schools**, 112 S.W.3d at 135 (citing **Schlater**, 833 S.W.2d at 925).

When piercing the corporate veil, a court may disregard the corporate entity in order to impose liability against a related entity, such as a parent corporation or a controlling shareholder, where the two entities are in fact identical or indistinguishable and where necessary to accomplish justice. **Manufacturers Consol. Serv., Inc. v. Rodell**, 42 S.W.3d 846, 866 (Tenn. Ct. App.2000). When a subsidiary corporation is used as a mere instrumentality of a parent corporation, our Supreme Court has held that the corporate veil of the subsidiary may be pierced to reach the parent if three elements are present:

(1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.

(2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

**Continental Bankers Life Ins. Co. of the South v. Bank of Alamo**, 578 S.W.2d 625, 632 (Tenn. 1979). Some courts have also required these three elements in actions to impose individual liability on a shareholder of a corporation who is in reality the corporation's "alter ego." **See, e.g., Island Brook Homeowners Ass'n, Inc. v. Aughenbaugh**, No. M2006-02317-COA-R3-CV, 2007 WL 2917781, at *6 (Tenn. Ct. App. E.S. Oct. 5, 2007); **Tennessee Racquetball Investors, Ltd. v. Bell**, 709 S.W.2d 617, 622 (Tenn. Ct. App. 1986); **but see Schlater v. Haynie**, 833 S.W.2d 919, 925 (Tenn. Ct .App.1991) (stating that **Continental Bankers** addressed parent/subsidiary relationships and was therefore inapplicable to the case before it involving a corporation/stockholder relationship).

The most common factors used by Tennessee courts to determine whether to pierce the corporate veil were originally set forth in **Federal Deposit Ins. Corp. v. Allen**, 584 F.Supp. 386, 397 (E.D. Tenn. 1984), as follows:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

**Id.** (citing cases from various jurisdictions). Generally, no one factor is conclusive in determining whether to pierce the corporate veil; rather, courts will rely upon a combination of factors in deciding the issue. **Oceanics Schools**, 112 S.W.3d at 140. "Even though corporate formalities have been observed, one may still challenge the corporate entity by showing that he has been the victim of some basically unfair device by which the corporate form of business organization has been used to achieve an inequitable result." **Schlater**, 833 S.W.2d at 925.

**Pamperin v. Streamline Mfg., Inc.**, 376 S.W. 2d 428, 436-438 (Tenn. Ct. App. 2008).

The court carefully considered the proof on each of the relevant element that would trigger the court to pierce EPS's corporate veil to impute liability to Samples:

| Factor Considered | AmPharm's Proof | This court's Finding: |
|---|---|---|
| Whether the corporation was grossly undercapitalized | AmPharm contends that EPS was undercapitalized when it came to AHC to negotiate the CIPA concept and this is shown by EPS's reliance upon AmPharm to obtain necessary inventory to stay in business. | EPS may well have been undercapitalized when it began negotiating with AHC, but that is exactly why EPS was seeking a financial partner to further its CIPA idea. The court is not sympathetic to AmPharm's claims of having to provide inventory when AmPharm was aware of why EPS could not fund its own inventory. |
| The sole ownership of stock by one individual | AmPharm contends that Samples was the 100% owner of EPS at the time of the transaction and controlled EPS's checkbook. | The court agrees that Samples was a 100% owner of EPS. This alone, however, is not a reason to pierce the corporate veil. AmPharm knew EPS was wholly owned by Samples and even after negotiations for PharmAssist fell through, continued to seek to purchase EPS. The court finds Sample's sole ownership of EPS to be relevant, but in this case, not an indicator of misdealings. |
| The employment of the same employees or attorneys | AmPharm complains that EPS and Samples frequently used the same attorneys to represent them in both the proposed transaction with AHC and EPS's eventual sale to Windsor. | The court finds that this is a relevant factor to consider in most cases, but in this case the use of the same attorneys proved immaterial to the separate business dealings between Samples and EPS. |

| The use of the corporation as an instrumentality or business conduit for an individual or another corporation | AmPharm alleges that Samples took assets from EPS in order to pay down the First Union loan improperly when he could have caused EPS to repay AmPharm's debt. | Piercing the corporate veil is an equitable doctrine applied in extreme circumstances to prevent the use of a corporate entity to defraud or perform illegal acts. While AmPharm is displeased that EPS preferred repayment of other creditors over AmPharm, the court found no proof that Samples used EPS to defraud others or perform other illegal acts. Many of the acts AmPharm complains of are typical issues seen routinely in bankruptcy cases but certainly not among the most egregious warranting avoidance of corporate formalities. |
|---|---|---|

EPS's corporate veil should not be pierced in this case. EPS was an unsuccessful business venture that is not unlike many of the cases this court has seen. Considering all the facts and circumstances in this case, the court finds that EPS's debt to AmPharm is EPS's alone, and not imputed personally to Samples.

## CONCLUSION

For all the reasons stated herein, AmPharm was unable to show by a preponderance of the evidence that the debt owed to it by EPS is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B). The court finds Samples debt to AmPharm, if any, is DISCHARGED. Furthermore, the court finds no basis to pierce the corporate veil to impute EPS's debt to AmPharm personally to Samples. Counsel for the debtor shall prepare an Order not inconsistent with this Memorandum within ten (10) days of entry of the Memorandum.

**THIS MEMORANDUM WAS SIGNED AND ENTERED ELECTRONICALLY**

**AS INDICATED AT THE TOP OF THE FIRST PAGE**

This Order has Been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.